### In re BANKVEST CAPITAL CORPORATION, Debtor.

### Bankvest Capital Corporation, Plaintiff,

### v.

### Fleet Boston f/k/a Fleet National Bank f/k/a Bank of Boston, Defendant.

Bankruptcy No. 99–47760–JBR.
Adversary No. 01–4387.

United States Bankruptcy Court,
D. Massachusetts.

April 18, 2002.

Charles R. Bennett, Jr., Andrew G. Lizotte, Hanify & King, Boston, MA, for Stephen Gray, Liquidating Supervisor for Bankvest Capital Corporation, Plaintiff,

and Official Committee of Unsecured Creditors Movant.

Sabin Willett, Julia Frost–Davies, Tina Brozman, Bingham Dana, LLP, Boston, MA, for Fleet Boston f/k/a Fleet National Bank f/k/a Bank of Boston, Defendant.

## MEMORANDUM OF DECISION

JOEL B. ROSENTHAL, Bankruptcy Judge.

This matter came before the Court for a trial on the Debtor's Complaint to Avoid Postpetition Transfers pursuant to 11 U.S.C. § 549, and an evidentiary hearing on what, in hindsight, has proved to be a somewhat mistitled pleading, the Emergency Motion of Official Committee of Unsecured Creditors for Imposition of Sanctions Against Fleet National Bank and ARK CLO 2001–1 Limited for Violations of the Automatic Stay and Discovery Violations [# 534].[1] With the consent of the parties,[2] the matters were consolidat-

1. The Massachusetts Local Bankruptcy Rules, as they existed when the Emergency Motion was filed and as amended effective January 1, 2002, contemplate that emergencies can be dealt with within two days of the filing of a motion that requires emergency consideration. MLBR 9013–1(h). At the request of various parties, the hearing on the Emergency Motion was continued several times. As a result, the evidentiary hearing on the Emergency Motion was not held until over one year after the Motion was filed.

2. The plaintiff, BankVest Capital Corporation ("BankVest" or the "Debtor"), brought the adversary proceeding through Stephen Gray, the liquidating supervisor ("Liquidating Supervisor") appointed pursuant to the confirmed plan which grants the Liquidating Supervisor authority to pursue all causes of action, with one exception not relevant to these matters. Prior to confirmation, Mr. Gray and his firm, the Recovery Group, were employed as financial advisors to the Committee. The Official Committee of Unsecured Creditors, the movant in the contested matter, became the Post–Effective Date Com-

mittee on the effective date of the plan. Both committees, however, are identical and each is referred to herein as the "Committee".

On or about March 1, 2000 Fleet Bank, N.A. merged with and into Fleet National Bank, formerly BankBoston, N.A. Fleet National Bank ("Fleet") is the resulting entity. The caption, however, reflects the case as captioned by the Debtor and it is unclear if reference to "Fleet Boston" is to Fleet Boston Financial Corp., an affiliate of Fleet, or a description of Fleet as successor in interest to BankBoston. Whether the caption contains a misnomer is irrelevant, however, as the parties agree that only the actions of Fleet as successor to Fleet National Bank, formerly BankBoston, are at issue in these matters.

ARK CLO 2001–1[sic] is ARK CLO 2000–1 ("ARK"), the entity that purchased Fleet's claims in this bankruptcy. ARK is no longer a party in the contested matter; the dispute was resolved as part of a settlement among ARK, the Debtor, and the Committee, which settlement was reported to the Court during the confirmation hearing. The settlement was

ed for trial. The parties agree on most of the crucial facts but their ultimate conclusions drawn from those facts could not be more divergent. Based upon the evidence at trial and a review of the extensive pleadings filed in connection with these matters,[3] the Court makes the following findings and conclusions in the adversary proceeding and the contested matter pursuant to Fed. R. Civ P. 52, made applicable to these proceedings by Fed. R. Bankr.P. 7052, and in the case of the contested matter, by Fed. R. Bankr.P. 9014 as well.

### FACTS

On December 17, 1999 (the "Petition Date") an involuntary Chapter 11 petition was filed against BankVest. Although the Debtor originally told Fleet that it intended to contest the involuntary filing, on January 25, 2000 the Court entered an order for relief with BankVest's consent. On February 23, 2000 the Committee was formed.

Prior to the Petition Date the Debtor engaged in the origination, sale, securitization, and servicing of non-cancelable equipment leases and related services. The Debtor financed its operations through so-called "warehouse" credit facilities with various lenders, including the defendant, which would then be repaid upon the sale of portfolios, usually to a securitization conduit.

As of the Petition Date BankVest had three principal credit agreements with the defendant ("Fleet" or the "Defendant"): (i) a warehouse line with Fleet Bank dated August 21, 1998 (the "FBNA Warehouse Loan"), secured by security interests in certain leases, including proceeds thereof, and related equipment; (ii) a warehouse line, which actually consisted of two separate tranches designated "Loan A" and "Loan B," with BankBoston, N.A. dated June 3, 1999 (the "BankBoston Warehouse Loan"),[4] secured by security interests in other leases (the "BankBoston Warehouse Leases"), proceeds thereof, and related equipment as well as security interests in the Debtor's intellectual property and general intangibles; and (iii) a conduit facility dated September 30, 1998 (the "Conduit Facility"). In a proof of claim, dated June 28, 2000, and designated as Claim No. 788, Fleet alleges that, as of the Petition Date, the Debtor owed $15,661,992.38, which consisted of $11,815,385.11 and $3,500,000 in principal, attributable to Loans A and B, respectively, on the BankBoston Warehouse Loan, plus prepetition interest calculated at the respective default rates, and

---

never filed with the Court but in substance consisted of Ark withdrawing, or more precisely instructing Fleet to withdraw, the objection to confirmation, in exchange for the recognition of ARK's secured claim in an amount to be agreed upon by the parties. ARK was never a party in the adversary proceeding.

3. These pleadings were proffered by the parties and admitted into evidence at trial.

4. The parties sometimes refer to the BankBoston Warehouse Loan by various defined terms. For example, in the Joint Motion of Debtor, Fleet Bank, N.A. and Fleet National Bank To Approve Stipulation Modifying The Automatic Stay Nunc Pro Tunc To The Peti-

tion Date In Favor Of Fleet Bank, N.A. and Fleet National Bank dated June 12, 2000 (the "First Settlement Motion"), the BankBoston Warehouse Loans and the Fleet Warehouse Loans are collectively referred to as the "Fleet Warehouse Lines". Fleet filed two separate Motions for Relief from the Automatic Stay both dated September 19, 2000. Although each Motion for Relief refers to the debt and the collateral securing it as the "Fleet Warehouse Line" and the "Fleet Warehouse Collateral", the Motion for Relief introduced as Plaintiff's Exhibit 12 is the Motion for Relief dealing with the BankBoston Warehouse Loan. For clarity, the Court will refer to the loan at issue as the BankBoston Warehouse Loan.

collection costs. In the proof of claim, Fleet listed the value of the collateral securing this Loan as "undetermined."

In December 1999 the Debtor ceased its lease servicing operations and pursuant to various servicing agreements, FINOVA Loan Administration, Inc. ("FINOVA") took over the lease servicing of, among others, the Fleet and BankBoston Warehouse Leases. The parties agree that the Debtor instructed FINOVA to remit the lease proceeds it collected pursuant to the Fleet Warehouse Loan and the BankBoston Warehouse Loan to Fleet effective as of January 1, 2000.

From the Petition Date until the entry of the order for relief (the "Gap Period"), Fleet received the sum of $2,155,427 (the "Postpetition Payments")[5] from the estate. The Postpetition Payments were generated from two sources. Most of the money came from the sale of a certain lease portfolio ( the "Marlin Portfolio") to Marlin Financial & Leasing Co. (the "Marlin Sale"). In order to accomplish the Marlin Sale, the Debtor sought and obtained Fleet's agreement that it would release its liens on the Marlin Portfolio. Upon consummation of the Marlin Sale, the proceeds were paid directly to Fleet and applied to the BankBoston Warehouse Loan. The remainder of the Postpetition Payments came from lessees' payments pursuant to their respective leases. They were turned over to Fleet which applied those to the BankBoston Warehouse Loan as well. Fleet acknowledges that it knew of the bankruptcy when it received and applied the Postpetition Payments. The Debtor and its counsel also knew of the Postpetition Payments and in fact, after the entry

of the order for relief, the Debtor, through its attorney, instructed FINOVA to cease forwarding payments to Fleet. In that same communication, the Debtor's counsel referred to the Postpetition Payments, although not by dollar amount, and called them "arguably appropriate."

In June 2000 Fleet and the Debtor filed the First Settlement Motion seeking to modify the automatic stay *nunc pro tunc* to the Petition Date in order for Fleet to receive certain proceeds in the hands of FINOVA and apply them to the outstanding indebtedness. In the First Settlement Motion, there is no mention of Fleet's receipt and application of the Postpetition Payments. In fact, in that Motion Fleet and the Debtor represented

> During the course of this Chapter 11 case, the Debtor and FINOVA Loan Administration, Inc. ("FINOVA"), which has been servicing the leases that constitute Fleet's above-referenced collateral, have been retaining the collections associated with that collateral. (First Settlement Motion at ¶ 2).

Moreover in the Stipulation and Consent Order, attached to the First Settlement Motion, Fleet and the Debtor further represented

> Consistent with directions from the Debtor not to disburse to Fleet any remittances received by FINOVA from lessees under the Fleet Warehouse Leases [defined in the First Settlement Motion as the leases securing either the Fleet Warehouse Loan or the BankBoston Warehouse Loan] (such remittances now or hereinafter held by the debtor or FINOVA, as the case may be, are referred to herein as the "Fleet Ware-

---

**5.** Although the parties stipulated that $2,155,427 was received during the Gap Period, this is not quite accurate. According to the spreadsheet that is part of an e-mail transmission dated January 11, 2001 from Fleet's

counsel to counsel for the Debtor and the Committee, and introduced as part of Plaintiff's Exhibit 14, a *de minimis* amount was received by Fleet on January 26, 2000, one day after the entry of the order for relief.

house Lease Proceeds"), FINOVA has held and maintained all Fleet Warehouse Lease Proceeds in its custody and control. FINOVA has advised Fleet that, as of May 22, 2000, FINOVA holds Fleet Warehouse Lease Proceeds in the approximate aggregate amount of $1,481,577. The Debtor has advised Fleet that, as of the date of its execution hereof [the Stipulation is undated], it does not hold any Fleet Warehouse Lease Proceeds. (Stipulation and Consent Order at ¶ K).

The Committee objected on several grounds including the lack of information as to the value of the collateral; whether Fleet was, at that time, oversecured or undersecured with respect to each of the Warehouse Loans; and whether, in general, there were grounds to grant relief from the automatic stay. Specifically the Committee noted

> The Debtor acknowledges, in paragraph L of the Stipulation, that the Debtor's use of the Fleet Warehouse Lines Collateral would result in the diminution of Fleet's interest in such assets. The Committee requires more information respecting the balance owed on each Fleet Warehouse Line [*i.e.,* the Fleet Warehouse Loan and the BankBoston Warehouse Loan], and the value of the Fleet Warehouse Lines Collateral securing each facility prior to evaluating the accuracy of this representation. (Opposition at pp. 10–11).

After a hearing the Debtor and Fleet submitted an amended Stipulation and

Consent Order which did not address the issue of the then-outstanding indebtedness, other than to state that the "unpaid principal balances of the various Fleet Warehouse Lines, as of the Petition Date, are... BankBoston Revolver Loan A-$12,074,550; BankBoston Revolver Loan B-$3,500,000...." [6] Moreover the amended Stipulation and Consent Order does not indicate the value of the collateral securing the various loans. The Committee was opposed to the Stipulation and Consent Order, even after amendment. The Court, also expressing its concern of the lack of sufficient information,[7] denied the First Settlement Motion without prejudice.

On August 30, 2000, following the denial of the First Settlement Motion, Fleet's counsel sent the following e-mail communication to the Committee's counsel:

> The Recovery Group recently called Fleet for information concerning Fleet's outstanding balances on the two warehouse loans and the conduit facility. Those figures are set forth below. The warehouse loan figures are the same as are set forth in Fleet's proofs of claim (i.e., the figures are as of the petition date), inasmuch as Fleet's valuations for the two warehouse portfolios leave each loan substantially undersecured. The conduit facility balance is as of May 31, 2000, the date of Fleet's most recent valuation of the conduit lease portfolio (collections since May 31 will have reduced the conduit facility balance and, similarly, reduced the value of the portfolio).

---

**6.** The amount listed for Loan A is approximately $34,000 higher than the total of the principal and interest attributable to Loan A in Claim No. 788. The difference may result from charging virtually all of the costs of collection to this Loan but the court notes that the balance of Loan B as set forth in the amended Stipulation and Consent Order does

not reflect any interest or other costs attributed to that Loan in Claim No. 788.

**7.** In the order of August 25, 2000 denying the First Settlement Motion without prejudice, the Court expressed concern over the "penal nature" of certain provisions of the Stipulation and also cited to "issues raised under M.L.B.R. 4001–2(d)."

Fleet Bank, N.A. warehouse loan: $2,842,709.99

Fleet National Bank warehouse loan: $15,661,992.38

Conduit Facility: $74,984,888.93

The warehouse loan figures do not include fees, cost and charges incurred or to be incurred by Fleet on or after the petition date. . . .

The implication of this e-mail is clear; Fleet acknowledged that the Committee, through its financial advisors, sought information about the "outstanding balances," a crucial fact to be considered in any request for relief from stay. Fleet's counsel made specific reference to the balance of the Conduit Facility as of a date some six months after the Petition Date and reminded the parties that collections after that date would further reduce the balance owed on the Conduit Facility. Yet he referenced the BankBoston Warehouse Loan balance only as of the Petition Date. Whether by clever use of language designed to mislead or imprecise statements resulting from lumping the two separate warehouse Loans together, a fair reading of the e-mail is that it represented that Fleet continued to be owed the same amount on the BankBoston Warehouse Loan as was owed on the Petition Date. In fact the only reference to any potential adjustment to the BankBoston Warehouse Loan is an acknowledgment that the "figures do not include fees, cost and other charges incurred or to be incurred." Because this same transmission calls the Warehouse Loans "substantially undersecured," the Court finds this communication

to be a correct assertion of the law, namely, that because the Loan is undersecured, interest, costs, and fees cannot be added to the claim and thus the balance had not increased. However inadvertent or unintentionally misleading these representations may have been, the e-mail inaccurately answered the simple question posed by the Committee: how much does the Debtor owe Fleet. Moreover, the misrepresentation continued.

After the First Settlement Motion was denied, Fleet moved for relief from the automatic stay (the "Relief from Stay Motion") pursuant to 11 U.S.C. § 362(d)(2) [8] in order to foreclose on the collateral securing the BankBoston Warehouse Loan. In that motion Fleet alleged that it was significantly undersecured. Specifically Fleet stated

Fleet will prove at trial that the market value of the Fleet Warehouse Collateral, as of May 30, 2000, is $7,968,710.00. The valuation report on which Fleet relies was prepared by KPMG and is annexed hereto as *Exhibit E* (the "KPMG Report"). Because of the nature of the Fleet Warehouse Collateral, together with other factors unique to such lease portfolio, will affect the value of the Fleet Warehouse Collateral. [sic] Fleet will submit an updated valuation of the Fleet Warehouse Collateral as the hearing on this motion approaches.

As more particularly set forth in the Proof of Claim filed by Fleet on or about June 29, 2000, as of the Petition Date, the Debtor was indebted to Fleet in

---

8. 11 U.S.C. § 362(d) provides, in pertinent part:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization. . . .

respect of the Fleet Warehouse Line Documents [described therein as those securing the BankBoston Warehouse Loan] in the amount of $15,661,992.38. Because the amount of the Fleet Claim secured by the Fleet Warehouse Collateral is nearly twice the fair market value of the Fleet Warehouse Collateral, the Debtor does not have any equity in the Fleet Warehouse Collateral. (Motion for Relief at ¶¶ 32 and 33).

Although MLBR 4001–1(b)(2)[9] requires a party moving pursuant to section 362(d)(2), as was Fleet, to state, among other things, the amount of the debt allegedly owed, Fleet only disclosed the amount of the debt owing as of the Petition Date in comparison to the value of the collateral valued as of May 30, 2000, again creating the impression that there was no postpetition pay down of the BankBoston Warehouse Loan. Both the Debtor and the Committee objected to the Relief from Stay Motion and sought discovery, first from Fleet and later from ARK as well, to prepare for an evidentiary hearing on the Motion for Relief. As more specifically discussed below, this discovery, or lack thereof, was one on the areas complained of in the Emergency Motion.

In September 2000 Fleet and the Debtor filed a second joint motion to approve a stipulation modifying the automatic stay *nunc pro tunc* to the Petition Date (the "Second Settlement Motion") to which the Committee filed a limited objection. The limited objection, however, did not address the Postpetition Payments which still had not been disclosed to the Committee or to the Court by Fleet. In fact, the Second Settlement Motion, which is substantially similar to the First, contained the same representations as the First Settlement Motion, namely that FINOVA was holding all of the proceeds from lessees under the collateral leases; one material difference was that the amount sought to be received and applied to the BankBoston Warehouse Loan had increased to $2,235,391.14, presumably because of additional collections. This amount, however, still does not include the Postpetition Payments nor are they disclosed elsewhere in the Second Settlement Motion. A second material change was Fleet's agreement to release some of the money to the estate. After a hearing and resolution of the Committee's objection, the Court approved the Second Settlement Motion. Pursuant to the order Fleet was to pay the Debtor "the greater of (a) 4% of the aggregate amount of the Fleet Warehouse Lease Proceeds delivered by FINOVA to Fleet, in the form of immediately available funds, no later than September 29, 2000, and (b) $100,000. Such funds shall be free and clear of any liens, claims, encumbrances, or interests asserted or assertable by Fleet." (Order dated September 29, 2000 at ¶ 4). It was the Court's understanding at the time of the hearing on the Second Settlement Motion that the payment Fleet was to make was based on the Committee's understand-

---

**9.** MLBR 4001–1(b)(2) provides:

If a movant seeks relief with respect to a stay of an act against property pursuant to 11 U.S.C. § 362(d)(1) or (d)(2), then the movant shall state:

(A) the amount and priority of the debt alleged to be owed to the movant;

(B) the identification, amount, and priority of each other encumbrance affecting the property, including real estate taxes and other municipal charges;

(C) the total of the amounts set forth in (a) and (b);

(D) the fair market value and liquidation value of the collateral with any available appraisal(s) attached; and

(E) either that (i) there is no other collateral securing the obligation, or (ii) there is other collateral securing the obligation, indicating the identity, value and valuation method attaching any available appraisal(s).

ing of the total amount of money that had been paid to Fleet during the bankruptcy. The approval of the Second Settlement Motion, however, did not resolve the still-pending Motion for Relief. Nor were these parties able to reach a resolution of Fleet's objection to the proposed plan of reorganization which the Debtor and the Committee first filed on July 3, 2000.[10]

On January 8, 2001, with the evidentiary hearing on Fleet's Motion for Relief less than one month away, Fleet disclosed to the Debtor's counsel that the bank had been paid over $2 million during the Gap Period and that it had applied those payments to the BankBoston Warehouse Loan. This conversation was confirmed the next day by a letter in which Fleet's counsel stated in part:

> As we discussed yesterday, on Friday, in the course of preparing for depositions, we found that we had been under a misapprehension as to the so-called "BankBoston warehouse." [sic] Approximately $2.1 million was applied to principal on that loan in the January, 2000 time frame, rather than having been held in suspense and as collateral for the loan. We are in the process of getting you the records on this matter (a process somewhat complicated by the cut-over from BankBoston to Fleet).
>
> As you and I discussed, this application appears to have been to the debtor's benefit. I also understand that this kind of arrangement was expressly called for in earlier stipulations. I advised you that while Fleet is prepared to reverse these applications and return the funds

to a suspense account held as collateral security for a loan now owned by Patriach [apparently ARK's predecessor in interest], it might be to the debtor's detriment to do so. This is because application of the funds reduced the principal amount and thus reduced, on that portion of the loan principal, the debtor's interest costs by the difference between the contract rate and the treasury rate, which, to a first approximation, would exceed $100,000. . . .

Although the Committee's counsel was not copied on that letter, the Committee soon learned of the existence of the Postpetition Payments and on January 11, 2001 Fleet's counsel provided the Debtor's and Committee's attorneys with a spread sheet showing the application of the Postpetition Payments to the BankBoston Warehouse Loan and interest calculated at the contract non-default rate.

Very soon thereafter, on or about January 25, 2001 ARK, through its attorney,[11] filed a Notice and Evidence of Transfer of Claims ("Notice of Transfer of Claims") confirming that, on or about December 28, 2000, Fleet transferred "all right, title and interest" to Fleet's claims in this case, including those claims evidenced by Claim No. 788.[12] The Notice further states that "[t]he subject transfer was unconditional, absolute and other than for security."

At the same time the Committee filed its Emergency Motion in which it not only sought sanctions for the application of the Postpetition Payments, but also sought

---

**10.** The plan and disclosure statement went through several iterations. On May 31, 2001 the Court entered an order confirming the Fifth Joint Liquidating Plan of Reorganization as modified (the "Plan").

**11.** ARK was represented by Richard Casher, then of Bingham Dana LLP. Mr. Casher also represented Fleet during this bankruptcy.

Bingham Dana LLP continues to represent Fleet in these matters.

**12.** It is unclear when Fleet informed the parties of the sale of the loans to ARK but the Debtor's counsel would have learned of it no later than the January 8, 2001 e-mail.

denial of the Motion for Relief and costs and attorneys' fees for Fleet's and ARK's failure to comply with discovery requests propounded in connection with the Committee's preparation for the evidentiary hearing on the Motion for Relief.[13] Fleet and ARK filed a joint opposition to the Emergency Motion in which they asserted that the Committee was unreasonable in its approach to discovery and that the Debtor benefitted for the application of the Postpetition Payments. ARK, however, withdrew the Motion for Relief almost immediately after the Emergency Motion was filed in order to foreclose any discovery of the transfer of Fleet's claims to it after the Court ordered that the sale documents be produced for the Court's review. Thereafter, the Debtor, the Committee, and ARK reached an agreement regarding the treatment of ARK's claims. ARK was dismissed as a party to the contested matter and, in exchange, ARK withdrew or caused fleet to withdraw the objection to confirmation of the chapter 11 plan.

After confirmation, however, the Committee, the Debtor, and Fleet continued their battle over the Postpetition Payments. Each side sought summary judgment; both motions were denied and the Emergency Motion was scheduled for an evidentiary hearing. Shortly before the hearing, however, the Debtor's Liquidating Supervisor commenced the adversary proceeding pursuant to section 549 of the Bankruptcy Code,[14] in large part because Fleet asserts that it repeatedly told the Committee that a section 549 avoidance action, not a motion for sanctions, was the appropriate vehicle for bringing these matters before the Court. Once the Liquidating Supervisor filed the section 549 action, however, Fleet moved to dismiss and for judgment on the pleadings under Fed. R.Civ.P. 12(b)(6) and (c) asserting that the claim was not preserved under the confirmed plan, was barred by laches, and was of no benefit to the estate. Additionally Fleet asserted that it offered to reverse the transaction prior to Confirmation but the Debtor "passed on the offer and kept silence [sic], declined to litigate, and gratefully accepted Fleet's offer to withdraw any objection to plan confirmation." (Fleet's Memorandum of Law in Support of Its Motion to Dismiss). The Liquidating Supervisor and the Committee also sought judgment on the pleadings but after oral argument, the Court denied the motions and the matters were set to be tried together, with the consent of the parties, in February 2002. Immediately before trial and after the time to supplement trial exhibits and witness lists had

---

**13.** Those alleged discovery abuses were themselves the subject of a separate motion to compel and included ARK's failure to appear at a scheduled deposition and ARK and Fleet's failure to produce documents relating to the transfer of the Warehouse Loans and the Conduit Facility to ARK.

**14.** Section 549 provides in part:
 (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
 (1) that occurs after the commencement of the case; and
 (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or

 (B) that is not authorized under this title or by the court.
 (b) In an involuntary case, the trustee may not avoid under subsection (a) of this section a transfer made after the commencement of such case but before the order for relief to the extent any value, including services, but not including satisfaction or securing of a debt that arose before the commencement of the case, is given after the commencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that the transferee has.

passed, it was not surprising that the parties engaged in a dispute over, among other things, some additional documents to be offered at trial. The surprise, however, came in seeing one of the documents Fleet proposed to introduce.

After resisting production of the relevant ARK sale documents since they were first requested by the Committee, Fleet offered the Purchase and Sale Agreement (the "ARK Sale Agreement")[15] as an exhibit at trial. The document was admitted over BankVest and the Committee's objection. In advocating for its admission, Fleet claimed that it was responding to the Court's question raised at the hearing on the motion to dismiss concerning what was transferred to ARK. Fleet now argued that the ARK Sale Agreement was relevant because it shows what the balance of the BankBoston Warehouse Loan was and therefore what was not available to be transferred, namely the previously paid amount, from Fleet (via JJDD, Fleet's conduit) to ARK. Although Fleet is correct in its assertion that the ARK Sale Agreement shows what was not transferred, it perhaps more forcefully defines what was transferred.

Although the ARK Sale Agreement requires some effort to follow the thread of defined terms woven within other defined terms, at its essence it documents a simple, albeit expensive, sale transaction whereby Fleet, through JJDD, transferred, among other things, "a 100% undivided participation interest (the '*Participation*') in the Participated Loans [including the BankBoston Warehouse Loan[16]] ... and the Transferred Rights related thereto...." The Transferred Rights, in turn, include

> with respect to each Loan Agreement, any and all of the First–Tier Seller's [Fleet's] and Seller's [JJDD's] right, title, and interest in, to and under the related Loans and commitments, if any, and to the extent related thereto, the following (excluding, however, the Retained Interest, if any, related thereto):
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (b) the Loan Agreement and all related Loan Documents and the Proof of Claim, if any;
>
> (c) all claims (including "claims" as defined in Bankruptcy Code § 101(5)), suits, causes of action, and any other right of the First–Tier Seller ..., **whether known or unknown,** against the related Borrower, the related Obligor, if any, or any of their respective Affiliates, agents, representatives, contractors, advisors, or any other Entity that in any way is based upon, arises out of or is related to any of the foregoing...:
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (e) all cash, securities, or other property, and all set-offs and recoupments,

15. The Purchase and Sale Agreement, dated December 21, 2000, is between JJDD LLC ("JJDD"), as seller, and ARK, as the purchaser. JJDD, an entity established to transfer Fleet's loans to ARK, is the buyer under purchase and sale agreement (the so-called "First Tier Purchase and Sale Agreement"), also dated December 21, 2000, between Fleet National Bank, as seller, and JJDD whereby JJDD purchased certain interests and rights in both participated and nonparticipated loans from Fleet. The First Tier Purchase and Sale Agreement was not offered but Fleet acknowledges that the intent of these related transactions was to transfer Fleet's rights and interests in certain loans to ARK via JJDD.

16. The ARK Sale Agreement defines a Participated Loan as any loan other than the Nonparticipated Loans, which, in turn, are loans listed on the Schedule of Nonparticipated Loans. The omission of the BankBoston Warehouse Obligation from that schedule confirms that it is a Participated Loan.

received or effected by or for the account of the First–Tier Seller . . . under the related Loans and Commitments, if any, and other extensions of credit under the related Loan documents (whether for principal, interest, fees, reimbursement obligations, or otherwise) after the close of business on [October 9, 2000], including all distributions obtained by or through redemption, consummation of a plan or reorganization, restructuring, liquidation or otherwise of the related Borrower, any related Obligor or the related Loan Documents, and all cash, securities, interest, dividends, and other property that may be exchanged for, or distributed or collected with respect to, any of the foregoing;

\* \* \* \* \* \*

(h) all proceeds of the foregoing.

(Emphasis added).

Fleet transferred, and intended to transfer all of its rights except for any Retained Interest. The definition of Retained Interest, however, unlike that of Transferred Interest, is narrowly drawn. A Retained Interest is:

With respect to each Loan Agreement, (i) all interest and . . . other similar ordinary course fees . . . payable under the related Loan Documents in respect of any Loan or Loans that are Current Loans [including the BankBoston Warehouse Loan [17]] and the commitments related thereto, if any, that accrue during the period on or prior to the close of

business on [October 9, 2000], together with other property paid or delivered in connection with the related Loan Documents (including Lender Collateral delivered pursuant to a foreclosure or other exercise of remedies under the related Loan documents) on or prior to the close of business on [October 9, 2000] . . . .

The transfer is, as the Notice of Transfer of Claims states, "absolute" [18] and "unconditional." It included more than just Fleet's bankruptcy claims as set forth in the proofs of claims. While the ARK Sale Agreement gives Fleet the right to retain amounts it was paid before October 9, 2000, the Agreement divests Fleet of virtually everything else, including all "known or unknown" claims and the proceeds of such claims as long as the claims are based upon, related to, or arise out of the loans sold.

It is against this backdrop of facts that the Court now reviews the claims and defenses advanced by each side.

## PRESERVATION OF THESE ACTIONS

Fleet, as it did in its Motion to Dismiss, argues that the Debtor failed to preserve the avoidance action in the Plan and thus the complaint must be dismissed. Alternatively, Fleet argues that the avoidance action is barred by laches and, even if the Liquidating Supervisor obtains a judgment, it is of no value to the estate as

---

17. The definition of "Current Loan" refers the reader to Schedule 1 which requires an examination of Annex B. The BankBoston Warehouse Loan is listed in Annex B and thus, in addition to its other appellations, is also a Current Loan.

18. The ARK Sale Agreement is clear that the transfer is absolute. It specifically provides:

Seller irrevocably sells, transfers, assigns and conveys without recourse, except as otherwise provided herein, (A) the Participation, (B) the Nonparticipation Transferred rights and (C) all of Seller's rights, remedies, interests, powers and privileges under the First–Tier Purchase and Sale Agreement (including any security interest created thereby or assigned thereby) to Buyer with effect from the date hereof. . . .

Fleet would receive a secured claim for the value of the judgment.

 Ordinarily confirmation of a plan bars a debtor from bringing avoidance actions not expressly reserved in the plan. *Harstad v. First American Bank (In re Harstad)*, 39 F.3d 898, 903 (8th Cir.1994). The need to reserve a claim derives from section 1123(b)(3)(B) of the Bankruptcy Code.[19] That section has been held to be, at least in part, a notice section, while other courts frame it as a standing issue. *Goodman Bros. Steel Drum Co. v. Liberty Mutual Insurance Co. (In re Goodman)*, 247 B.R. 604, 608 (Bankr.E.D.N.Y.2000) and cases cited therein. Although the language reserving the claim must be clear and unequivocal, it does not need to describe each reserved claim individually; a reservation of the right to bring a type of claim is sufficient.

 In the instant case the Plan clearly conferred standing on the Liquidating Supervisor and preserved the Debtor's right to bring this suit through the Liquidating Supervisor. The Plan expressly grants the Liquidating Supervisor authority "to investigate, prosecute and if necessary, litigate, any Cause of Action, except for the D & O Claims, on behalf of the Debtor and shall have standing as an Estate representative. . . ." (Plan at section 6.3). Causes of Action, in turn, include Avoidance Actions (Plan at section 1.22), which expressly include section 549 avoidance actions. (Plan at section 1.14). Further it is clear

that Fleet should have known that the Liquidating Supervisor would likely bring an avoidance action against the bank given Fleet's acknowledgment that it instructed the parties that a section 549 action was the correct proceeding in which the dispute arising from the application of the Postpetition Payments should be decided.

Fleet advances several equitable and often inconsistent arguments to support its contention that the suit is barred by laches. Fleet's argument that it was lulled into believing that no adversary proceeding would be commenced and therefore it was somehow duped into withdrawing its objection to confirmation is simply wrong. Once Fleet sold its claims to ARK, it lacked standing to object to the plan based upon the treatment of those claims under the Plan. That objection belonged to ARK which chose to withdraw it.

 Fleet has also asserted that the Debtor's failure to bring the avoidance action earlier "robbed" Fleet of the opportunity to object to confirmation and therefore somehow constituted a fraud in the procurement of the confirmation order. This argument is inconsistent with Fleet's contention that it could not have objected to confirmation of the plan because, having sold the loans, Fleet lacked standing to object. But a party does not necessarily need to be a creditor in order to object to confirmation. Section 1109(b) grants "a party in interest" the right to "be heard on any issue" in a chapter 11 proceeding.[20]

---

**19.** Section 1123(b)(3) provides:
Subject to subsection (a) of this section, a plan may—
 * * * * * *
(3) provide for—
 * * * * * *
(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest. . . .

**20.** Section 1109(b) provides:
A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case arising under this chapter.

Fleet does not deny that it received copies of each iteration of the plan and disclosure statement.[21] It challenges, however, that it could have objected to confirmation of the plan.

Although the Bankruptcy Code contains 46 separate references to a "party in interest," the Code does not define what is meant by the phrase. Fleet's inferred definition that the phrase is synonymous with the word "creditor" is clearly incorrect. First, Section 1109 uses the word "including" to list types of parties who can be parties in interest. The word "including," however, is not intended to be a limiting term. 11 U.S.C. § 102(3).[22] Second, the legislative history expressly indicates that Congress intended that courts would interpret the phrase in light of the facts of a particular case.

> Congress' failure to define party in interest specifically was discussed by both Senator DeConcini and Representative Edwards during the proceedings preceding the enactment of the Bankruptcy Code of 1978. Senator DeConcini stated: "Rules of bankruptcy procedure or court decisions will determine who is a party in interest for the particular purposes of the provision in question."

*In re River Bend–Oxford Associates*, 114 B.R. 111, 113 (Bankr.D.Md.1990) (citation omitted).

Courts that have addressed the meaning of the phrase "party in interest" have held that the parties in interest include not only creditors "but any entity whose pecuniary interests might be directly and adversely affected by the proposed action." *In re Savage Industries, Inc.*, 43 F.3d 714, 720 (1st Cir.1994) (citations omitted). Courts have also concluded that the term includes "anyone who has a practical stake in the outcome of the case" and those "who, because of the impact of the reorganization, deserve fair representation in the case. . . ." *In re Delta Underground Storage Company, Inc.*, 165 B.R. 596, 598 (Bankr.S.D.Miss.1994) (citations omitted). Although Fleet's potential liability as a future defendant in an adversary proceeding might have been too attenuated to give it standing as a creditor, *see DuVoisin v. Anderson (In re Southern Industrial Banking Corp.)*, 66 B.R. 349, 361 (Bankr. E.D.Tenn.1986) [prospective right to a section 502(h) claim is not a contingent claim under section 101(4)(A)], it was a party to the contested matter and it therefore was aware that its rights could be affected by the Plan, especially given Fleet's repeated characterization of the Committee's position, namely, that the confirmation order extinguished any lien Fleet might otherwise have on any avoided transfers.[23]

## VIOLATION OF THE AUTOMATIC STAY

The Committee asserts that Fleet's application of the Postpetition Payments during the Gap Period violated the automatic stay. Fleet counters by citing the right of the involuntary debtor to continue operating its business during the gap period as an absolute defense. Resolution of this

---

**21.** Fleet's counsel, who was also ARK's counsel, was present at the confirmation hearing and acknowledged that Fleet was withdrawing its objection to confirmation pursuant to instructions from ARK. There was no mention of any objections or even concerns that Fleet had independent from the one concerning treatment of the Fleet and BankBoston Warehouse Loans under the Plan.

**22.** Section 102 provides in pertinent part:

> In this title—
> (3) "includes" and "including" are not limiting. . . .

**23.** The Court does not reach the issue as framed by Fleet in light of the language of the ARK Sale Agreement.

portion of the dispute requires an examination of the relationship between seemingly inapposite Code sections.

## THE RELATIONSHIP BETWEEN 11 U.S.C. §§ 303(f) AND 362

■ The automatic stay [24] is triggered by the filing of a petition, whether voluntary or involuntary. *In re E.D. Wilkins Company*, 235 B.R. 647, 649 (Bankr. E.D.Cal.1999). "Section 362 automatically enjoins, in both voluntary and involuntary petitions, proceedings by most creditors against the debtor's assets.... The automatic stay provision is critical because it prevents a 'race to the debtor's assets'—one of the central problems that the bankruptcy law seeks to avoid." J. Mullin, *Bridging the Gap: Defining the Debtor's Status During the Involuntary Gap Period*, 61 U. Chi. L.Rev. 1091 (1994)(footnotes omitted). "Secured creditors, for example, will be prevented from exercising their repossession rights upon default." *Id.* at n. 24.

■ The automatic stay, in turn, prevents a creditor from taking any action to enforce its lien, among other things. *E.D. Wilkins*, 235 B.R. at 649 ("This estate is automatically protected by a stay against, among other things, the enforcement of claims and liens. 11 U.S.C. § 362(a); *but see In re Acelor*, 169 B.R. 764, 765 (Bankr. S.D.Fla.1994). *If a creditor wishes to enforce a claim or lien against property of the estate, it must first obtain relief from the automatic stay.*") (Emphasis added).

Fleet cites the decidedly minority view holding that the automatic stay does not apply to involuntary cases during the gap period. *See Acelor*, 169 B.R. at 765. It argues that, because the Debtor had the right to conduct its business during the Gap Period, including making payments to Fleet, pursuant to section 303(f),[25] Fleet's acceptance and application of those payments could not be violative of the stay. Fleet's analysis is flawed, however. The majority position articulated in *E.D. Wilkins*, namely that the automatic stay is applicable upon the filing of an involuntary petition, is correct. First, the language of section 362 is clear: it applies to a petition

24. 11 U.S.C.A. § 362 provides in pertinent part:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—
(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
(4) any act to create, perfect, or enforce any lien against property of the estate;
(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;
(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title...

25. Section 303(f) provides:

Notwithstanding section 363 of this title, except to the extent that the court orders otherwise, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced.

*filed* under section 303. It does not limit the application to those instances where a petition is filed and an order for relief enters. Because the language is unambiguous, there is no need to look beyond it. But if further support were needed, it can be found within the Bankruptcy Code as well. Section 303(f) refers to an involuntary debtor using its property to carry on its business. It does not address a creditor *taking* the property. Moreover, Congress's intention that section 362 should apply to involuntary cases can be inferred from the omission of any reference to section 362 within the text of section 303(f). "Because § 303(f) specifically mentions only § 363, it arguably may exempt the gap debtor only from § 363, rather than from all the restrictions of the code. Indeed, this would be entirely logical; § 363 imposes stringent notice and court approval requirements on debtors, and thus it would be difficult, if not impossible, for many gap debtors to function normally if they were bound by the strictures of § 363." *Bridging the Gap* at 1095. The filing of an involuntary petition pursuant to section 303 creates an estate. There is nothing in the Code or the underlying policies of section 362 (including the protection and preservation of assets for the benefit of all creditors) that suggests that an estate, however created, should not be protected by the automatic stay.

### EFFECT OF VIOLATING THE AUTOMATIC STAY AND RETRO-ACTIVE RELIEF

▇▇▇▇ Fleet's application of the Postpetition Payments violated the automatic stay. Actions taken in violation of the automatic stay are void. *Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 976 (1st cir.1997). Equitable considerations can alter the outcome, however, and if appropriate, a court can grant retroactive relief from the stay. But retroac-

tive relief is an extraordinary measure and the circumstances that justify it are likely to be "far and few between," *id.* at 977, and often involve wrongdoing on the part of the debtor, or the innocent acts of a creditor who was unaware of the bankruptcy. It is the burden of the offending creditor to demonstrate that his void actions should be given validity retroactively. *Id.* Fleet did not meet this burden. Indeed its defenses to the stay violation lack merit, and often, credibility.

Fleet offers multiple defenses for its actions: first, the Debtor knew about the payments; second, Bankvest produced a roomful of documents which may have contained information about the Postpetition Payments to the Committee's accountants; third, the payments actually benefitted the estate because the payment decrease the default rate of interest, thereby saving the estate over $200,000, and finally, it offered to return the Postpetition Payments in exchange for a secured claim.

Fleet, which knew about the Postpetition Payments, did not disclose their existence to the Committee for approximately one year. Its desire to obtain relief from the stay retroactive to the Petition Date while at the same time alleging that FINOVA was holding all of the proceeds of its collateral strongly suggests Fleet knew that it needed something more than just prospective relief. Although the Debtor knew of the Postpetition Payments, the Committee (and the Court) did not. Giving the Committee's accountants "unfettered access" to a room full of documents that may have contained information about the Postpetition Payments does not change the balance nor does it negate proffers of inaccurate information. Furthermore these facts make the instant case distinguishable from *Adams v. Hartconn Associates, Inc. (In re Adams)*, 212 B.R. 703 (Bankr.D.Mass.1997), on which Fleet re-

lies. Whatever blame the Debtor bears for violation should not be imposed upon the Committee, and even if it were, it pales in comparison to Fleet's questionable representations.

Nor does Fleet's secured status excuse its violation. In *In re Omni Graphics, Inc.,* 119 B.R. 641 (Bankr.E.D.Wis.1990), the debtor had turned over collateral to its secured lender prior to the filing of an involuntary petition against the debtor. The secured lender, who had notice of the involuntary proceeding, sold the property postpetition without relief from the stay. The court, finding that the secured creditor was given only possession and not title to the collateral, found that the lender violated the automatic stay. It specifically rejected the lender's argument that it was protected by section 303(f). "§ 303(f) is intended to enable a debtor involved in an involuntary petition to continue doing business during the so-called 'gap period' before the entry of an order for relief. It is not intended as a shelter for the Bank." *Id.* at 643. Although the court went on to determine that the violation was not so egregious as to warrant punitive damages, the court required the creditor to turn over the proceeds to the trustee because the sale was void.[26] The court went on to say that "[t]his does not necessarily mean that the Bank loses its status as a secured creditor unless the court invokes the doctrine of equitable subordination under § 510(c)." *Id.* at 644. *See also In re Datesman,* 1999 WL 608856 at *10 (Bankr. E.D.Pa.1999) (application of security retainer void and payment reversed).

In the instant case Fleet's violation of the automatic stay does not necessarily mean that it lost its status as a secured creditor. Nor does Fleet's status as a secured creditor at the time of the violation mandate that Fleet automatically is restored to that position upon divestiture of the Postpetition Payments. Fleet's status at the time of the disclosure of its violation of the automatic stay had changed. It had already sold its claim to ARK and what claim it gets upon return of the Postpetition Payments cannot ignore this sale. For this same reason Fleet's offer to return the Postpetition Payments in exchange for a secured claim *after* it sold the BankBoston Warehouse Loan to ARK is deficient.

Further, the purported savings to the estate, based upon Fleet's not charging the default rate of interest, is illusory. Fleet always maintained that it was an undersecured creditor and, indeed its sale of the BankBoston Warehouse Loan to Ark for approximately 50% of its face value confirms this status. Thus it is not entitled to any interest, regardless of the rate.

Having violated the automatic stay, Fleet must now return the Postpetition Payments. The parties should be restored to the same position they would have enjoyed had the void acts not occurred. Where they go from there depends on the type of claim, if any, Fleet now holds. Fleet maintains that it had a secured claim when it received the Postpetition Payments and therefore it has a secured claim when it returns the money. The answer, however, is not as simple as Fleet suggests.

Before turning to the issue of Fleet's claim, two points should be addressed briefly. First, assuming *arguendo* that the Committee proved that the violations were "wilful," the Committee is not entitled to costs and attorneys' fees. Section 362(h)[27] is explicit; it applies only to indi-

---

26. The purchaser of the assets was a BFP and therefore protected under section 550.

27. Section 362(h) provides:

viduals. *In re Just Brakes Corporate Systems, Inc.,* 108 F.3d 881 (8th Cir.1997); *In re Goodman,* 991 F.2d 613, 619 (9th Cir. 1993); *In re Chateaugay,* 920 F.2d 183, 186–87 (2d Cir.1990); *A & J Auto Sales, Inc. v. United States (In re A & J Auto Sales, Inc.),* 205 B.R. 676 (Bankr.D.N.H. 1996). *But see In re Atlantic Business and Community Corp.,* 901 F.2d 325, 329 (3d Cir.1990); *Budget Service Co. v. Better Homes of Va., Inc.,* 804 F.2d 289, 292 (4th Cir.1986).

Second, the Court must determine whether and how the Debtor was harmed by Fleet's action. Although an action for contempt may lie against Fleet, there is no need to reach this issue to compensate the estate for Fleet's actions. The injury incurred as a result of Fleet's actions is the same as that which the avoidance action, and recovery upon such avoidance, is designed to remedy, namely the loss of the property, in this case money, and interest that would have accrued to the estate's benefit on that money.[28]

## REMEDY FOR VIOLATION OF THE AUTOMATIC STAY

■ Because this Court is satisfied that Fleet has not met its burden to justify retroactive relief from the stay, the Postpetition Payments must be turned over to the Liquidating Trustee. To hold otherwise undermines the purpose of section 362(a) and could result in what the *Soares* court aptly called "a free-for-all." "In or-

der to secure important protections provided by the automatic stay, courts must display certain rigor in reacting to violations of the automatic stay." *Soares,* 107 F.3d at 975–76 (citation omitted). Moreover, giving retroactive effect to Fleet's actions would absolve Fleet of failing to disclose crucial information and the Court sees no reason under the facts presented to provide such sanctuary.

In addition the Liquidating Supervisor is entitled to collect interest on the Postpetition Payments. Although the Bankruptcy Code does not address whether a trustee may recover interest on recovered property prior to judgment, neither does it preclude prejudgment interest. Judge Kenner undertook an extensive analysis of this issue in *Gray v. Travelers Insurance Company (In re Neponset River Paper Company),* 219 B.R. 918 (Bankr.D.Mass.1998). Although undertaken in the context of a preference action, her analysis is equally applicable to this matter and confirms what this Court believes is the better reasoned approach, namely that prejudgment interest should be awarded. "Although equitable considerations will sometimes dictate otherwise, full compensation normally requires interest from the prejudgment date on which the liability arose." *Id.* at 921. Absent such an award, the injured party may not be made whole. Therefore, interest will be awarded pursuant to the rate set forth in 28 U.S.C. § 1961(a)[29] from the dates of the application of the Postpetition Payments.

An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

28. Fleet's argument that its violation benefitted the estate by reducing the interest rate on the unpaid Loan is disingenuous. Fleet repeatedly represented that it was significantly undersecured. Therefore it is not entitled to interest. Moreover, approval of the Second

Settlement Motion was based upon a representation that Fleet was undersecured, and the amount paid by Fleet was similarly based upon a misrepresentation of the amount it would receive postpetition from its collateral. Fleet is now estopped from asserting that it is oversecured and therefore entitled to interest.

29. 28 U.S.C. § 1961(a) sets the rate (the "Federal Judgment Interest Rate") at "the weekly average 1–year constant maturity

## FLEET'S CLAIM UPON RETURN OF POSTPETITION PAYMENTS

■ Once Fleet returns the Postpetition Payments, plus interest, the question becomes what type of claim, if any, does it have. Certainly as an undersecured creditor, it has no right to recover any interest so the interest it must pay to the estate does not give rise to any claim. What claim, if any, it has upon return of the Postpetition Payments is the same as arises if the Postpetition Payments are avoided in the section 549 avoidance action.

## SECTION 549

Section 549 permits a trustee to avoid postpetition payments in all but the most narrow of circumstances.[30] The trustee, in this case the Liquidating Supervisor, need only show that the Postpetition Payments were made after the commencement of the involuntary and that they were neither authorized by the Court or the Bankruptcy Code. There is no disagreement as to the timing of the transfers at issue; they all occurred postpetition. Nor were these Payments authorized by the Court.[31] And the Code carves out a narrow exception, in section 549(b), for postpetition transfers in involuntary cases during the gap period only where new value is given for such transfers. Section 303(f) is not a *carte blanche* authorization of all of an involuntary debtor's postpetition activities, even those carried out in the course of his business.

Nor, again, does Fleet's secured, or rather undersecured, status at the time of the transfer save it. *In re Fort Dodge Creamery Co.*, 121 B.R. 831 (Bankr. N.D.Iowa 1990). Thus it is clear that the Postpetition Payments are to be avoided.

Fleet's argument that it would be fruitless to avoid the Postpetition Payments because they would simply revert to the bank, and therefore there can be no value to the estate, is wrong. And that is because Fleet does not have a right to any claim; ARK does.[32]

Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." The Court will use the an average of the Federal Judgment Interest Rates in effect on the dates on which Fleet applied the Postpetition Payments. That rate is 5.99%.

30. Section 549 provides in relevant part:
 (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
 (1) that occurs after the commencement of the case; and
 (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
 (B) that is not authorized under this title or by the court.
 (b) In an involuntary case, the trustee may not avoid under subsection (a) of this section a transfer made after the commencement of such case but before the order for relief to the extent any value, including services, but not including satisfaction or securing of a debt that arose before the commencement of the case, is given after

the commencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that the transferee has . . . .

31. Fleet has not attempted to argue, nor would the Court find persuasive, that the undisclosed Postpetition Payments were authorized pursuant to the Second Settlement Agreement. This Court is not inclined to issue orders validating undisclosed violations of the automatic stay.

32. Whether ARK continues to have a claim against the estate turns on the issue of what the settlement among ARK, the Debtor, and the Committee provides. The Court has never been asked to determine the amount of ARK's claim, a procedure which, pursuant to the Plan, was to be invoked if the Debtor, the Committee, and ARK could not reach a consensus and therefore the Court presumes that this matter was resolved without the need for Court involvement.

██ Once a transfer is avoided under section 549, the party whose transfer is avoided gets a claim under section 502(h).[33] The Court asked the parties to address the issue of what type of claim arose by virtue of this section. Fleet asserts it is a "resurrection" of its old secured claim; the Committee responded that it is only an unsecured claim. Neither is the correct answer.

Section 502(h) derives from section 57n of the Bankruptcy Act which provided that claims "arising in favor of a person by reason of recovery by the trustee from such person of money or property, or the avoidance by the trustee of a lien held by such person" were to be filed within thirty days of the recovery or avoidance. Section 57n was intended to govern the time within which such a claim must be filed. When the Bankruptcy Act was amended in 1939, the legislative history contains only a passing reference to whether the claim arising by reason of recovery is a new claim or a resurrection of the claim that had been satisfied by the property subsequently recovered by the trustee. "We have also added a provision which broadly is declaratory of existing law, namely, that a creditor from whom a transfer is recovered or against whom a lien is avoided in favor of the estate, may file a *reinstated* claim within thirty days from the date of such recovery or avoidance." Analysis of H.R. 12889, 74th Cong., 2d Sess. (1936) 180, reprinted in 3 COLLIER ON BANKRUPTCY (14th Ed.1976), § ¶ 57.32 at 440–41, N.3. Although this language lends credence to Fleet's argument, Fleet has tendered the instrument of its undoing in the form of the ARK Sale Agreement. Although Fleet would have had a claim se-cured by the Postpetition Payments, that is, the proceeds of the BankBoston Warehouse Loan, under section 502(h), it sold the right to such a claim to ARK. It transferred Claim No. 788, all the documents related to the BankBoston Warehouse Loan, and most importantly, all claims, whether "known or unknown" related to the foregoing, and all proceeds derived from any claim. It must turn over the Postpetition Payments to the Liquidating Supervisor but it has no claim against this estate.

As set forth above Fleet's return of the Postpetition Payments would also need to be accompanied by interest in order to make the Debtor whole. Thus, the award on the complaint is coextensive with that for the motion for sanctions for violation of the automatic stay. Obviously the Liquidating Supervisor and the Committee may not each recover nor will the judgment include a double recovery.

### CONTEMPT ACTIONS

██ The decision in this case is harsh enough that it may deter such future behavior. But the Court has lingering concerns over the inaccurate representations of Fleet and its counsel during this bankruptcy. The judicial process relies heavily on the integrity of all involved and demands that representations of counsel be made in good faith. *See* Fed. R. Bankr.P. 9011. And it may be that the misrepresentations made to this Court were inadvertent and were the result of miscommunications between counsel and client (and the Court is aware of the so-called "cutover" from BankBoston to Fleet

---

**33.** Section 502(h) provides:

A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

when, as a result of the BankBoston and Fleet merger, Fleet assumed responsibility for this loan). Consequently the Court will take no further action with respect to any questionable representations or omissions of critical information in pleadings filed with and in oral presentations made to this Court.

Similarly, the Court's ruling that Fleet divested itself of any claim upon return of the Postpetition Payments obviates the need to conduct any further proceedings to determine whether Fleet's behavior warrants subordination pursuant to section 501(c).

## CONCLUSION

A separate order, consistent with this decision, will issue.

## ORDER

In accordance with the Memorandum of Decision of even date, it is hereby OR-DERED:

1. That the Emergency Motion of Official Committee of Unsecured Creditors for Imposition of Sanctions Against Fleet National Bank and ARK CLO 2001–1 Limited for Violations of the Automatic Stay and Discovery Violations [# 534] is AL-LOWED and FleetBoston is obligated to pay to the Liquidating Supervisor the amount of $2,155,427 (the "Postpetition Payments"), plus prejudgment interest at the rate of 5.99% per annum, calculated to be $290,497.65 (collectively with the Post-petition Payments, the "Judgment Amount");

2. That judgment in Adversary Proceeding No. 01–4387 shall enter in favor of the Plaintiff in the amount of $2,155,427 (the "Postpetition Payments"), plus pre-judgment interest at the rate of 5.99% per annum, calculated to be $290,497.65 (collectively with the Postpetition Payments, the "Judgment Amount");

3. That FleetBoston shall pay the amount of $2,445,924.65 forthwith to the Liquidating Supervisor;

4. That the Liquidating Supervisor shall hold the Judgment Amount in an escrow account pending a determination of whether ARK CLO 2001–1 has a claim to any part of the Judgment Amount; and

5. That the Liquidating Supervisor, within the next forty-five days, shall file either (i) evidence that ARK has no claim to the Judgment Amount, (ii) an agreement between the Liquidating Supervisor and ARK as to any claim ARK may have to the Award, or (iii) an appropriate proceeding seeking a determination of this issue.